BOBBY WILSON
2151 N. Avenida Tabica
Green Valley, AZ 85614
Telephone: 520-982-1658
Email: bobbysvisa(at)gmail.com
PLAINTIFF,
In Propria Persona

FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 15 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | | |
|---|---|---|
| BOBBY WILSON, | ) | NO. CV-19-130-TUC-JR |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| PHOENIX NEWSPAPERS, INC., | ) | **COMPLAINT** |
| GANNETT COMPANY, INC., | ) | |
| HUGO PUBLISHING CO. INC., | ) | |
| Et al., | ) | |
| | ) | (Action for Libel and |
| | ) | Slander and Damages) |
| Defendants. | ) | |
| | ) | Jury Demanded. |
| | ) | |

Plaintiff, in Propria Persona, alleges as follows:

**I. JURISDICTION.**

1. The United States District Court has original jurisdiction over this matter pursuant to 28. U.S.C., Section 1332(a), and Section 1367, et. seq.

## II. VENUE.

2. Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C., Section 139 1(b) because the Defendants are subject to the personal jurisdiction in this District and/or a substantial part of the events giving rise to these claims occurred in this District, including publication, distribution, and injury to the Plaintiff who resides in Pima County, Arizona and there exists diversity of citizenship between these parties and the amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and fees as required to sustain subject matter jurisdiction in this Court.

## III. PARTIES.

### A. Plaintiff

3. Plaintiff, Bobby Wilson (Bobby) is a citizen of the United States and a long time resident of Pima County, Arizona. Bobby is a retired lawyer and college professor. Bobby is not licensed in Arizona to practice law.

### B. Defendants

4. Defendant, *Phoenix Newspapers, Inc.* (PNI) is incorporated in the state of Arizona. It is a domestic corporation that publishes and distributes the *Arizona Republic Newspaper*. It also controls the entity known as *azcentral.com* and its content distributed over the Internet worldwide.

5. Defendant, *Gannett Company, Inc.* (Gannett) is the parent company of Defendant PNI. It is incorporated in the State of Delaware and is a foreign corporation. It is a media giant controlling hundreds of newspapers and television stations worldwide, including *USA*

*Today*.

6. Defendant, *Hugo Publishing Company Inc.* (Hugo), is a corporate entity incorporated in the State of Oklahoma and is a foreign corporation. It controls and owns the *Hugo Daily Newspaper* and its weekly companion newspaper known as the *Choctaw County Times*.

7. Defendant, Dustin Gardiner (Dustin), is an employee and reporter for Defendant PNI, and its affiliate *USA Today Network*. He is a resident of Arizona.

8. Defendant, Allison Steinbach (Allison), is an employee of, and reporter for the Defendant PNI and the *USA Today Network*. She is a resident of Arizona.

## IV. <u>PLAINTIFF'S ACTION.</u>

9. This is an action seeking monetary damages against all named Defendants, jointly and severally, for their libelous and slanderous torts in publishing and distributing, locally, nationally, and internationally, publications which were false statements or accusations, or the Defendants were reckless in their actions. Defendants maliciously targeted Bobby with their false statements and destroyed his reputation and his candidacy for the State Senate of Arizona.

10. Not only were the published statements of Defendants false and misleading in nature, they constituted libel and slander per se because their published articles branded Bobby as a murderer by publishing a false article that he, "confessed to murdering his mother and sister in 1963," and then Defendants followed up several weeks later and published that Bobby, "threatened to kill the president of an HOA."

11. Bobby was accused of confessing to murder and threatening to kill another person

accusations would constitute libel and/or slander per se under Arizona laws. See: 13 A.R.S., Section 1202(A). See: Exhibit "A", attached and incorporated herein for all purposes.

12. These Defendants committed libel per se when they published print and internet articles which "on their face and without the aid of any extrinsic matter tended to bring" Bobby "into disrepute, contempt or ridicule" and attacked Bobby's integrity, virtue or reputation. *Ilitzky v. Goodman*, 57 Ariz. 216-21(Ariz.1941).

13. Defendants are also guilty of invasion of the privacy of Bobby's private life by showing Bobby's history in a "false light" by Defendants malicious publications of false articles of statements never made by Bobby. These Defendants engaged in tabloid journalism in order to advance their distribution of print and online networks for monetary gain and to advance Defendants' careers and notoriety.

14. Defendants have intentionally or recklessly published and republished said false articles about Bobby to maliciously cause Bobby emotional distress and to destroy Bobby, and Bobby's employment opportunities, and destroy Bobby's reputation and chances to succeed as a political candidate at that time, and in the foreseeable future.

## CONDITIONS PRECEDENT TO FILING

Plaintiff is praying for punitive damages in this case against all Defendants. Bobby has complied with the provisions of 12 A.R.S., Section 653.02-03 and gave Defendants an opportunity to publically retract Defendants' false publications about Bobby. Defendants rejected Bobby's demand and actually replied to said demand by stating, "we stand by what we published." See Exhibit "B" attached herein and incorporated by reference.

## V. FACTUAL ALLEGATIONS.

A. Bobby was born on September 3, 1944 in California. A year later Bobby's sister, Judy, was also born in California. Their mother, Lavonne Winkler (Lavonne) was unmarried. In July of 1948, Lavonne contacted the California Department of Welfare and requested they take custody of her two children. The California Department of Welfare opened an investigation into the matter and discovered conflicting accounts in Lavonne's background. Lavonne became alarmed and fled the state and moved Bobby and his sister to the state of Oregon and applied for welfare. The Oregon Welfare Department opened an investigation into Lavonne's background. In 1952, Lavonne departed Oregon with her boyfriend, Bill Harris and relocated to the state of Vermont. One year later, Lavonne filed a false child abuse case against Bill Harris and stole his automobile and cash, and fled back to Oregon with her two children. Lavonne purchased a rifle on the trip for protection. Several months later, Lavonne stole her new boyfriend's wallet and moved to Hugo, Oklahoma and purchased a farmhouse in a rural area. Lavonne registered Bobby and his sister in public school under assumed names, and began living under the name Lavonne Wilson. Lavonne applied for State Aid for dependent children with the state of Oklahoma and received state welfare until July of 1962 when the state of Oklahoma terminated her payments.

B. Bobby and his sister attended Hugo High School and upon Bobby's eighteenth birthday, Bobby volunteered for and enlisted in the Oklahoma National Guard. Bobby graduated with honors on June 1, 1963 and awaited his Army orders to begin Army basic training at Fort Polk, LA.

C. From July of 1962 up and until June 1963, Bobby assumed responsibility for financially supporting the family, working at Ford's Grocery Store in Hugo, Oklahoma. Bobby's mother worked part-time as a waitress at a local café. Lavonne was under investigation by the states of Oregon, Vermont, California and Oklahoma, by the date of her death.

D. On or about June 17, 1963, Bobby came home from work to find his sister alone in their farmhouse. Bobby went fishing in their nearby farm pond and returned at dark with several fish which he cleaned and then prepared supper for his sister and himself. Approximately at ten-thirty in the evening they both retired to their respective bedrooms for the night. Bobby's mother had not returned home when Bobby and his sister went to sleep.

E. In the early morning hours of the following day, Bobby was suddenly awakened when Bobby's mother turned on the single light bulb in Bobby's bedroom and started screaming at him, "Get out of bed." Lavonne was pointing a fully loaded semi-automatic .22 rifle at Bobby. Bobby reached up and turned off the blinding light bulb. Lavonne started shooting at Bobby, firing at least six times. Bobby crawled under his steel constructed bed for protection. Bullets hit the bedpost and ricocheted around the bedroom and smashed two gallon jars of gasoline, which was in the corner of the bedroom. Gasoline soon covered the bedroom floor.

F. Judy, Bobby's sister, hearing the noise came into the dark bedroom and Lavonne saw Judy's shadow and thought it was Bobby and she swung her rifle like a baseball bat, striking Judy in the head and Judy collapsed unto the floor. Bobby discovered his single-

6

striking Judy in the head and Judy collapsed unto the floor. Bobby discovered his single-shot .22 rifle under his bed and fired one shot over his bed in the general area of Lavonne's shadow. The bullet struck Lavonne in the head and she collapsed unto the floor.

G. Bobby found the light bulb string in the dark and pulled it and discovered his mother and sister lying on the gasoline soaked floor and Lavonne and Bobby's sister were bleeding profusely from their wounds. The totally closed house was now reeking with gasoline fumes. Bobby ran to the front room to call for help from their only telephone and when Bobby pulled the light string to the ceiling light bulb the house exploded.

H. Bobby was blasted through a nearby window and his head hit a fence post and Bobby lost consciousness. A neighbor, hearing the explosion appeared and found Bobby and pulled him away from the blazing frame farmhouse just as the brick chimney on the house collapsed unto the bodies of his mother and sister. Bobby was taken to a nearby hospital suffering from burns and lacerations and head trauma.

I. An investigation was started by the local Sheriff's office due to evidence that seemed to prove Bobby's mother and sister died before the house fire. Bobby was unable to explain to the authorities what occurred, and was charged with their deaths. Bobby was suffering from total amnesia of what actually occurred.

J. Two separate murder trials were later commenced which resulted in a legal finding that Bobby was in fact suffering from total amnesia of the events. Bobby never confessed to murdering anyone. The local newspaper publisher, Jack Stamper, was allowed by the County Sheriff to interview Bobby in the county jail, without counsel. Bobby refused to

make any confession of murder by him, but because Bobby was poor without legal counsel, and eighteen years old, Jack Stamper decided to take advantage of Bobby's situation and published in the local newspaper, *Hugo Daily News,* and companion weekly paper, *The Choctaw County Times,* that Bobby had confessed to murdering his mother and sister. Jack Stamper, the publisher, later recanted that newspaper article under oath that Bobby had confessed to him about murdering his family during the second criminal trial; as did the County Sheriff, Ed Thornton.

K.  Therefore, Bobby never confessed to murdering anyone and the murder and arson charges against Bobby were subsequently dismissed at the request of the District Attorney.

L.  Bobby went on with his life after that terrible ordeal was over. Bobby worked his way through college and law school in Texas and practiced law and taught law at various Texas colleges until 1994 when Bobby relocated to Arizona.

M.  In 1995 Bobby obtained certification, after a background investigation, by the State of Arizona, which granted him a *lifetime* college teaching certificate to teach any level of college courses on the subjects of Political Science or Law. Bobby has taught at Arizona Colleges from 1995 until August 22, 2018 when Bobby was suddenly fired, without case, when Bobby's supervisors read Defendants' publications in August of 2018.

N.  Bobby filed a Federal Complaint against his college employer for his unlawful termination and started *a Gofundfme* campaign entitled *Due Process and Equal Protection for Adjuncts* to raise litigation funds for his termination case. Defendants discovered Bobby's Federal Complaint and used that as an excuse to *republish* their

libelous and slanderous articles again, in which Defendants again branded Bobby as confessing to "Murdering his mother and sister" and "Threating to kill an HOA president."

O. In 1998 Bobby applied at the Arizona Department of Public Safety for a Private Investigator's license. A F.B.I. background investigation was conducted, and finding no criminal convictions, Bobby was granted his P.I. license, which he held until 2012 when Bobby sold his successful P.I. agency to his company manager.

P. In the same year, Bobby applied at the Arizona Department of Public Safety for a Concealed Carry Permit, so Bobby could lawfully carry a firearm in Arizona. Another full F.B.I. background investigation was conducted and Bobby was granted his CCP license. It remains in force to the present, with periodic renewals performed over the years. Therefore, Bobby has no criminal convictions on his record, unlike the Defendants tried to convince the public with their said libelous articles.

Q. Ten years after all charges were dismissed against Bobby in Oklahoma, Bobby suddenly recovered his memory of those tragic events of 1963 while working for a client who had experienced a similar fate.

R. In 2010 Bobby wrote a memoir of the events in June of 1963 in a book entitled, *Bobby's Trials*. It is the only true version that has been published about the events surrounding the deaths of Bobby's mother and sister.

S. In 2018, when the Defendant reporters were covering the Arizona Senate Primary Race, Bobby's opponent in the Republican primary provided said reporters with negative information on Bobby. Defendants requested an interview with Bobby, which Bobby

information on Bobby. Defendants requested an interview with Bobby, which Bobby freely accepted. Those Defendant reporters, such as Allison, asked Bobby about the events of 1963 in Oklahoma. Bobby gave the reporters a free copy of his book, *Bobby's Trials* and expressly warned them "not to republish the 1963 Oklahoma Newspaper headline article that stated Bobby confessed to "Murdering his mother and sister," because it was untrue and libelous, and if their employers republished that article(s) Defendants would be publishing a libel and slanderous article(s) and Allison and Defendant newspapers would be held responsible for their actions. Bobby clearly stated, "I never confessed to anyone, that I murdered anybody," because Bobby had not. The only true account of what happened to Bobby and his family in 1963 was set forth in Bobby's book, *Bobby's Trials*.

T. Obviously, the Defendants chose to disregard Bobby's express warnings about republishing that false and libelous account that was published by the Defendant Hugo in 1963 and now has been republished numerous times by the Defendants in 2018 and 2019.

## VI. VIOLATIONS OF JOURNALISTIC ETHICS AND STANDARDS BY DEFENDANTS.

15. The Professional Code of Ethics and Canons of Journalism, which are applicable to print, broadcast, and online news organizations have several common elements. They are requirements of: Truthfulness, accuracy, objectivity, impartiality, fairness, and public accountability, and the principle of "Limitation of harm."

16. All named Defendants have violated and ignored the above said standards and ethic codes in these matters, for example: In Bobby's case:

        wrong impression to Defendants' readers;

    (b) Defendants did not tell the truth and Defendants intentions were bad;

    (c) Defendants did not verify their articles or reports with "the actual facts";

    (d) Defendants did not find two or more witnesses to any event Defendants published or reported;

    (e) Defendants did not "fact check" with neutral reporters, concerning Bobby's background.

17. The Defendants' publication of headlines stating Bobby supposedly "Confessed to murder" and "Threatened to kill someone" were published libels, and the Defendants had not adequately investigated the facts as was their legal duty as journalists, newspapers, and Internet social outlets. Defendants said false headlines, published numerous times, intentionally, with malice and were reckless. Neither compassion, nor respect was shown Bobby, who obviously had been wrongfully accused in both incidents because the matters were later officially dismissed by the authorities.

18. Defendants Allison and Dustin reporters violated their own code of conduct as journalists and were untrue, inaccurate, unfair, and in bad taste, and neither reporters were impartial, or showed public accountability. The Defendants used sound-bites such as, "Confessed to murder," and "Threat to kill," to attract readers attention to their published articles for monetary and journalistic gain for themselves to destroy Bobby's reputation.

19. Bobby in his 2010 published book, *Bobby's Trials* clearly stated that Jack Stamper, then the editor and publisher of Defendant Hugo newspapers, was lying when Hugo

published the original libelous headlines, "Bobby Wilson confesses he murdered his mother and sister last Thursday."

20. Jack Stamper, at the second murder trial admitted that Bobby never confessed to killing anyone. The best evidence would have been for Defendants to obtain and read the actual trial testimony of Jack Stamper or to speak to an actual witness to Jack Stamper's testimony and also that of the County Sheriff who testified at that trial, had never heard Bobby confess to any murders.

21. Furthermore, Defendant reporter Dustin failed to obtain a copy of, and read the official police report of the incident in Mexico that he wrote about. That official report of property damage to a door makes no mention of any threats to kill, which is a crime in Mexico and in Arizona. That matter was officially dismissed. The English translation of that police report is marked Exhibit "C" and is attached and incorporated herein for all purposes.

22. The actions of all Defendants in publishing and distributing those two sound-bites and false headlines and distributing them worldwide were acts of libel, slander, liber per se, slander per se, and were done intentionally or in reckless disregard for their truthfulness and were published maliciously to harm and destroy Bobby's reputation and his candidacy for political office.

## VII. **DIRECT ATTACK ON NEED TO PROVE MALICE.**

23. It is currently accepted law in the United States that a public figure must prove that a Defendant acted with malice in libeling or slandering him or her. That is bad law and the time has arrived to right a miscarriage of justice. The U.S. Supreme Court case known as

*New York Times v. Sullivan*, 376 U.S. 254 (1964) essentially *federalized* the common law of libel and slander in the United States by decreeing the "actual malice" of a libeling publication must be proved by a public figure before recovery of damages is allowed.

24. The *Sullivan* case was wrong when it decreed such a high standard and that decision violated the 14th Amendment and 10th Amendment of the U.S. Constitution.

25. The clear language of the "equal protection" clause of the 14th Amendment states that all American citizens are entitled to equal protection of our laws. Nowhere in the Constitution does it refer to "public figures" as a sub-class of Americans that are to be treated differently or penalized for their public figure status. They are therefore, not being treated equally when they are required to prove malice in a libel suit, but an average citizen or private citizen does not have that same burden of proof in a libel suit.

26. The 10th Amendment of the Constitution leaves to the various states control of their laws that are not in conflict with federal matters. Therefore, all the states controlled their libel and slander common laws until the *Sullivan* case in 1964.

27. Supreme Court Justice Thomas, recently in his concurring opinion in *McKee* v. *Cosby, Jr.* No. 17-1542, 586 U.S. (2019), said that the *Sullivan* case is bad law and when the "appropriate case" appears on their docket – The Supreme Court needs to "reconsider" the accuracy of the malice requirement in public figure libel suits. He further said,

> "If the Constitution does not require public figures to satisfy an actual malice standard in state law defamation suits, then neither should we."

The case at bar is a perfect set of facts for that appropriate case to be heard by the

13

Supreme Court; and this District Court should excuse Bobby from having to prove Defendants one or all, acted with actual malice in their attacks in print on Bobby's character.

## VIII. DEFENDANTS PUBLISHED NEGLIGENTLY AND WITH ACTUAL MALICE.

28. The Defendants published their false and defamatory accusations negligently and with actual knowledge of the falsity or a reckless disregard for the truth and as two of the worlds leading outlets, PNI and Gannett, knew, but ignored the importance of verifying damaging and incendiary false headlines against a political candidate such as Bobby.

29. By publishing their false newspaper headlines, Defendants recklessly rushed their headlines to social media such as *azcentral.com* and placed them in the mainstream media without verifying the truthfulness of the actual articles Defendants published.

30. All Defendants departed from the standards and ethics of the *Society of Professional Journalists' Code of Ethics* when it printed unverified false articles or accusations against Bobby.

31. Defendant, Gannett, owner of PNI is a media giant who paid over three billion dollars for the *Arizona Republic Newspaper* empire. Gannett made over a billion dollars in profits on its worldwide collection of newspapers and media in the last year. See: Exhibit "D" attached and incorporated herein by reference.

32. The worldwide broadcasts of the libelous false headlines concerning Bobby have caused Bobby to be harassed, threatened, and cursed by millions of people worldwide. Bobby is now extremely depressed, and emotionally harmed by those actions and

numerous death treats made to Bobby by Defendants' readers has caused Bobby to change his normal daily routine in order to protect himself and his family.

## IX. DAMAGES.

The publication of the false and defamatory accusations proximately caused substantial and permanent damage to Bobby emotionally, physically, and financially. The false and defamatory accusation were republished by Defendants and republished by third parties and members of the mainstream and social media mob of other news outlets, which was reasonably foreseeable. The false and defamatory accusations against Bobby are defamatory per se, as they are libelous on their face without resort to additional facts, and Bobby was subjected to public hatred, contempt, scorn, obloquy, and shame.

As a direct and proximate result of the false and defamatory accusations, Bobby suffered permanent harm to his reputation, as an individual, his professional reputation, and his reputation as a political candidate.

As a direct and proximate result of the false and defamatory accusations, Bobby suffers and will continue to suffer severe emotional distress and depression.

As a direct and proximate result of the false and defamatory accusations, Bobby is forced to live a life of constant state of concern over his safety and the safety of his family.

The Defendants published their false and defamatory accusations with actual malice and common law malice, entitling Bobby to an award of punitive damages. The Defendants' conduct was outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

Bobby is entitled to an award of punitive damages to punish Defendants and to deter

Defendants from repeating such egregiously unlawful misconduct in the future. Bobby is entitled to actual and punitive damages for the invasion of his privacy and the Defendants' intentional infliction of emotional harm and distress.

**WHEREFORE,** Bobby respectfully prays:

That judgment be entered against the Defendants, jointly and severally, for substantial actual and compensatory damages in an amount not less then Three Hundred and Fifty Million Dollars ($350,000.000).

That judgment be entered against the Defendants, jointly and severally for punitive damages in an amount not less than Six Hundred and Fifty Million Dollars ($650,000.000).

That Bobby recovers all his reasonable expenses and fees from Defendants. That all costs of this Action be taxed to Defendants, and that this Court grant all such other and further relief that this Court deems just and proper including equitable relief and make a judicial finding that Bobby does not need to prove the actions of Defendants were done with malice.

DATED this 15TH day of March, 2019.

Bobby Wilson
Plaintiff, in Propria Persona